# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

EVANGELINA MENDEZ; ANGEL
MENDEZ,
                        *Plaintiffs,*

            and

ARTURO JORGE GONZALEZ,
                        *Appellant,*

            v.

COUNTY OF SAN BERNARDINO; SAN
BERNARDINO COUNTY SHERIFF'S
DEPARTMENT; CITY OF HESPERIA;
JAMES MARTINEZ; ROD MEDLEY;
MARION BROWNE; CESAR REYES,
                        *Defendants-Appellees.*

No. 05-56118

D.C. No.
CV-04-07131-GPS

EVANGELINA MENDEZ; ANGEL
MENDEZ,
                        *Plaintiffs-Appellants,*

            and

JOSE MENDEZ; TIFFANY AUTREY,
                        *Plaintiffs,*

            v.

COUNTY OF SAN BERNARDINO; SAN
BERNARDINO COUNTY SHERIFF'S
DEPARTMENT; CITY OF HESPERIA;
JAMES MARTINEZ; ROD MEDLEY;
MARION BROWNE; CESAR REYES;
STEVEN LAWYER,
                        *Defendants-Appellees.*

No. 06-56424

D.C. No.
CV-04-07131-GPS

11787

EVANGELINA MENDEZ; ANGEL
MENDEZ,
                    *Plaintiffs-Appellants,*
                    and
ARTURO JORGE GONZALEZ,
                              *Appellant,*

                    v.                              No. 07-56029
                                                    D.C. No.
COUNTY OF SAN BERNARDINO; SAN            CV-04-07131-GPS
BERNARDINO COUNTY SHERIFF'S
DEPARTMENT; CITY OF HESPERIA;                       OPINION
JAMES MARTINEZ; ROD MEDLEY;
MARION BROWNE; CESAR REYES,
                    *Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of California
George P. Schiavelli, District Judge, Presiding

Argued and Submitted
June 11, 2008—Pasadena, California

Filed August 27, 2008

Before: Stephen S. Trott, Michael D. Hawkins and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher

**COUNSEL**

Shirley M. Hufstedler (argued), Morrison & Foerster, LLP, Los Angeles, California; Arturo J. Gonzales, Tony West (argued), and Geoffrey Graber, Morrison & Foerster, LLP, San Francisco, California, for the plaintiffs-appellants.

Eugene P. Ramirez, Manning & Marder, Kass, Ellrod, & Ramirez, LLP, Los Angeles, California; Patrick L. Hurley (argued), Manning & Marder, Kass, Ellrod, & Ramirez, LLP, San Francisco, California, for the defendants-appellees.

Brad Seligman, The Impact Fund, Berkeley, California; Robert Rubin, Lawyers' Committee for Civil Rights of the San Francisco Bay Area, San Francisco, California, for the *amici curiae* The Impact Fund and the Lawyers' Committee for Civil Rights of the San Francisco Bay Area.

**OPINION**

FISHER, Circuit Judge:

Plaintiff-Appellant Evangelina Mendez ("Mendez") and members of her family brought this suit against the County of San Bernardino, the City of Hesperia, the San Bernardino Sheriff's Department and various individual defendants (collectively, "the County") under 42 U.S.C. § 1983 and state law, alleging violations of their civil rights. This case arose from the aftermath of an officer-involved shooting that resulted in the death of Mendez's deaf-mute son, Ignacio, in July 2002. Although the legality of the shooting itself was not challenged, Mendez and another of her sons, Angel, alleged that the County falsely arrested them after the shooting, illegally searched the Mendez home and was negligent in the supervision and training of its officers. Some of Mendez's claims were resolved on summary judgment and others were voluntarily dismissed before trial; the remainder were tried before a jury, which found in Mendez's favor on the false arrest and illegal search claims and awarded her nominal and punitive damages. In this consolidated appeal, Mendez challenges the district court's decisions limiting the jury's consideration of her emotional damages, remitting her punitive damages award and granting summary judgment to the County on her state law negligent training claim. She also appeals the court's rulings denying her all attorney's fees and costs and sanctioning her attorney. She requests reassignment of the case to a different judge on remand. We affirm in part, reverse in part and remand without reassignment.

**BACKGROUND**

Mendez's son Ignacio was shot and killed by a police officer on the evening of July 2, 2002, during an armed standoff with police on the driveway of the Mendez's neighbor's home. Neither Mendez nor Angel was considered a suspect in any crime, but both were witnesses to the event. Shortly after

the shooting, Mendez was placed in the back of a police car on the scene. The officer who first placed her in the car testified that he "opened the door and asked her to have a seat." After about 10 minutes, Mendez began to hit the windows, asking to be released. An officer then transferred Mendez to a different police car parked nearby. She again beat on the windows in an attempt to ask for air; an officer eventually cracked open a window for her. After about two hours, Mendez and Angel were driven to the police station in separate cars for questioning. Mendez was not asked whether she consented to being brought to the station and the officer who brought her there never told her that she was free to leave.

At the station, Mendez was placed in a room with a closed door and questioned by two police officers, one of whom was Deputy Cesar Reyes. Reyes translated in Spanish for Mendez, who does not speak or read English and has minimal education. Reyes admitted that he did not tell Mendez that she was free to leave the station. When Mendez told Reyes that she wanted to see Ignacio, whom she did not yet know had been shot fatally, Reyes told her that she could not see him. While Mendez was being questioned, she was told to sign a form written in English, giving the police consent to search her home. Reyes did not translate the consent form for her, including a statement that would have informed her that her consent was voluntary and that she had a right to refuse. When Mendez questioned whether searching her home was necessary, Reyes put the paper in front of her and told her, "This is a paper you need to sign." Mendez then signed the form. Relying on Mendez's signed consent, police officers conducted a search of the Mendez residence without a warrant.

Mendez and Angel were released from the police station at around five or six in the morning on July 3. When Mendez returned home, she was at first blocked from entering because police were still investigating the shooting scene. When she was allowed to reenter later that morning, she saw that the

house had been searched and noted that "the closets were all out of order, and there were clothes thrown around and papers thrown around." Mendez's husband testified that Mendez was "crying uncontrollably" when she returned home and was having difficulty speaking. One of the officers who questioned Mendez admitted that she was upset during some points of the interview and that at times it was difficult for her to speak, although he attributed her anguish to her son's shooting. Mendez later explained to the jury that she felt "[l]ike a prisoner" while at the police station, because she did not know what had happened to Ignacio and was afraid for Angel's life.

Mendez and four family members brought this suit against the County of San Bernardino, the City of Hesperia, the San Bernardino Sheriff's Department and five individual defendants, including Deputy Reyes, the two police officers who drove Angel and Mendez to the police station, the supervisor in charge of the shooting scene and an officer who responded to an incident at the Mendez home on October 5, three months after the shooting. The plaintiffs later voluntarily dismissed their claims as to the October 5 incident, which removed this latter defendant and three Mendez family members — all but Mendez and Angel — from the case. The remaining claims alleged false arrest of Mendez and Angel under state law and the Fourth Amendment, illegal search under the Fourth Amendment, negligent failure to train the police officers under state law, and alleged that the County was liable for the constitutional violations under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), for failing to adequately train its officers. Prior to trial, the district court granted summary judgment to the County on the state law negligence claim and the *Monell* claim. The remaining claims proceeded to trial, where the jury found against Reyes for Mendez's false arrest under state and federal law and against Reyes for the illegal search of her home under federal law. The jury awarded Mendez $1 in nominal damages on each of these claims, plus $250,000 in punitive damages against Reyes, based on its finding that

he acted recklessly in depriving her of her constitutional rights. The jury found for the County as to Angel's claims.

## JURISDICTION

This case was brought under 42 U.S.C. § 1983; the district court had jurisdiction under 28 U.S.C. § 1331. The district court entered final judgment in June 2007, and Mendez timely appealed. The court denied Mendez's request for attorney's fees and costs under 42 U.S.C. § 1988(b) in a separate order, and Mendez timely appealed that order. The court also sanctioned Mendez's attorney in a separate order and Mendez and her attorney timely appealed the sanctions order. These three appeals have been consolidated for our review and we have jurisdiction over them under 28 U.S.C. § 1291. We shall consider Mendez's arguments concerning the trial itself first, followed by her arguments as to the court's denial of attorney's fees and entry of sanctions against her attorney.

## DISCUSSION

### I.   Jury Instruction on Mendez's Emotional Damages

Mendez first contends that the district court erred when it issued a sua sponte instruction to the jury limiting its consideration of her emotional damages. The jury initially received an instruction that Mendez's damages should be "the amount of money which would reasonably and fairly compensate the plaintiff for any injury you find was caused by the defendant." The district court later recalled the jury in the midst of deliberations and — over Mendez's objections — instructed it "that the evidence does not support an award of damages for any period after July 3, 2002," the day Mendez was released from the police station. It is well established that "[a] party is entitled to an instruction about his or her theory of the case if it is supported by law and has foundation in the evidence." *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). We review a district court's formulation of jury instructions for

abuse of discretion. *Id*. Mendez contends that the district court abused its discretion by limiting the jury's consideration of her damages to only the two days of events at issue, contrary to Mendez's theory of her case. We disagree and affirm the district court.

**A.**

Mendez presented fairly minimal evidence of any actual damages she suffered as a result of her illegal arrest and the illegal search of her home. During trial, she testified that she felt "[l]ike a prisoner" while she was at the police station, and that she "was desperate" and was afraid they might kill her son, Angel. She also recounted beating on the windows of the police car she was placed in after the shooting. A detective who interviewed Mendez on the night of July 2 agreed that she was upset during some points of the interview and that at times it was difficult for her to talk, although he believed that her anguish was related to Ignacio's shooting. Mendez's husband similarly testified that his wife was "crying uncontrollably" and unable to speak when she returned home from the police station. As to the ill effects of the illegal search, Mendez testified only that she noted upon her return that "the closets were all out of order, and there were clothes thrown around and papers thrown around."

Although this evidence arguably showed that Mendez had suffered emotionally *during* the false arrest and illegal search, she did not present any expert witnesses, medical evidence or even testify herself that she had suffered any *ongoing* ill effects from the illegal arrest and search. The only evidence she presented of any possible ongoing emotional damages at all occurred during the following exchange at trial:

> *Counsel*: Are you taking medication for depression now?
>
> *Mendez*: Yes.

> *Counsel*:    And when was that prescribed?
>
> *Mendez*:    After they killed my son.

Counsel did not, however, ask Mendez any follow-up questions to link her depression specifically to her emotional distress from the illegal arrest and search as opposed to any distress she felt from Ignacio's death. The only other evidence that Mendez now suggests could support a jury's finding of ongoing emotional damages was that she cried on the witness stand while recounting some of the events.

The district court first expressed concerns about the scope of the emotional damages instruction before closing arguments, when the County requested an instruction that neither Mendez nor Angel had suffered any damages other than nominal damages. The court was not persuaded that plaintiffs had failed to show *any* emotional damages from the events, but did flag its concern as to whether they had put forward any evidence of ongoing emotional damages. The court did not immediately rule on the issue, however, and counsel proceeded to make their closing arguments the next day. During a break between the defendant's closing argument and the plaintiff's rebuttal, the court raised the issue again, stating that it was aware of Mendez's testimony about depression, "but I would like to see the testimony indicating — pointing to specifically, the detention and the search as being the cause of that depression." Mendez's counsel willingly agreed to defer argument on the issue until after he had delivered his rebuttal; the district court then ordered both sides to prepare a record of transcript excerpts supporting ongoing emotional damages. The case was then submitted to the jury. After reviewing the parties' submissions, the court ruled the next morning that "limitation is appropriate, especially in light of the lack of specific evidence as to damages and their time frames." The court recalled the jury and issued a new instruction limiting its consideration of damages to the two days Mendez was in

custody. The jury ultimately returned an award of nominal damages for the false arrest and illegal search claims.

**B.**

Mendez raises two principal arguments against the district court's revised jury instruction. First, she contends that the court abused its discretion because there was a sufficient "foundation in the evidence" for the jury to have found that she incurred ongoing emotional damages, beyond the damages she suffered during the false arrest and illegal search itself. *Jones*, 297 F.3d at 934. We disagree. As Mendez essentially admits, the only evidence that she suffered any *ongoing* emotional distress was her testimony that she had been on anti-depressants since the day of the shooting. She never testified, however, that this depression was related to the illegal search and arrest, as opposed to any depression she may have felt at the traumatic death of her son, an event for which the County was not liable. She was never asked, nor did she testify, that she suffered any ongoing distress, ill feelings or delayed trauma as a result of the illegal arrest or search, nor did she put forth any medical evidence about the cause of her depression.

**[1]** Although we agree that emotional damages may be based on "humiliation and emotional distress established by testimony or inferred from the circumstances, whether or not plaintiffs submit evidence of economic loss or mental or physical symptoms," *see Johnson v. Hale*, 13 F.3d 1351, 1352 (9th Cir. 1994), this does not mean that emotional damages can be inferred *entirely* from circumstances, without any supporting testimony from witnesses. To the contrary, in *Johnson* the plaintiffs provided "detailed and substantial testimony" to support their emotional damages claim. *See id.* at 1353. In that case we were merely clarifying that they did not *also* need to present evidence of actual mental or physical symptoms. *See id.* Mendez also points to *Murphy v. City of Long Beach*, 914 F.2d 183, 186-87 (9th Cir. 1990), where we held

that a trial court did not abuse its discretion in ordering a new trial, when the trial court had concluded that it was erroneous to instruct a jury that a plaintiff's emotional distress was necessarily attributable to one of two possibly traumatizing events, only one of which was illegally caused by defendants. *Murphy* offers no support to Mendez, however, because in that case we did not consider what evidence the plaintiffs presented — or would need to present — to establish that they suffered ongoing emotional distress from the defendants' act. We agree that it is *possible* that Mendez suffered ongoing damages from both the illegal search and arrest as well as the death of her son. The district court did not abuse its discretion, however, because she presented no evidence to support that possibility.

**[2]** Second, Mendez argues that the timing of the jury instruction — coming after closing arguments, in the midst of jury deliberations — denied her due process. She relies on *United States v. Eisen*, 974 F.2d 246, 256 (2d Cir. 1992), which held that Federal Rule of Criminal Procedure 30 requires a trial court to rule on jury instructions prior to summation, "to afford the parties an opportunity to frame their closing remarks in light of the court's subsequent legal instructions." Even assuming the dubious proposition that this rule of federal criminal procedure is also a principle of constitutional due process applicable to civil trials, Mendez can neither show that she was "substantially misled in formulating [her] arguments" nor otherwise prejudiced. *Cf. id*. Mendez was on notice that the court had concerns about the scope of her damages instruction, but she agreed to defer the court's ruling on the matter until after her counsel had given his rebuttal argument. Further, her closing argument for damages was couched in very broad terms, telling the jury that there is no "magical formula" to assess damages and that they should just "be reasonable" and "fair to Mrs. Mendez." Her counsel's reference to the ongoing depression during closing arguments was brief and cannot show that she was "substantially misled" in formulating her arguments. *Id*. We affirm.

## II. Reduction of the Punitive Damages Award

**[3]** The jury awarded Mendez $1 each in nominal damages for her false arrest and illegal search claims and $250,000 in punitive damages against Reyes, whom it found to have acted in reckless disregard of her constitutional rights. After trial, the County moved to remit the award, arguing that it was excessive in violation of the Due Process Clause under *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), and *State Farm Mutual Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003). The district court agreed and reduced the punitive damages award to $5,000, finding the punitive damages award excessive "in light of the nominal compensatory damages awarded." We evaluate the constitutionality of a punitive damages award by following the guideposts provided by the Supreme Court, assessing: "(1) the degree of reprehensibility, (2) the disparity between the harm suffered and the punitive damages award, and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Bains LLC v. ARCO Prods. Co.*, 405 F.3d 764, 775 (9th Cir. 2005) (citing *Gore*, 517 U.S. at 574-75). We review the district court's application of the *Gore* guideposts to a jury's punitive damages award de novo, but defer to the district court's findings of fact unless they are clearly erroneous. *Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life Activists*, 422 F.3d 949, 953-54 (9th Cir. 2005). Mendez argues that the jury's award was not unconstitutionally excessive and so should be reinstated. We disagree and affirm the district court.

*State Farm* enumerates the factors we should consider when evaluating the reprehensibility of the defendant's conduct under the first guidepost. We look to whether

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulner-

ability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm*, 538 U.S. at 419. Reprehensibility falls along a scale, with "acts and threats of violence at the top, followed by acts taken in reckless disregard for others' health and safety, affirmative acts of trickery and deceit, and finally, acts of omission and mere negligence." *Swinton v. Potomac Corp.*, 270 F.3d 794, 818 (9th Cir. 2001) (internal quotation marks omitted). "Although determining the degree of reprehensibility ultimately involves a legal conclusion, we must accept the underlying facts as found by the jury and the district court," because district courts have a "somewhat superior vantage" in assessing the defendant's conduct. *Leatherman Tool Group, Inc. v. Cooper Indus., Inc.*, 285 F.3d 1146, 1150 (9th Cir. 2002) (internal quotation marks omitted).

Applying the Supreme Court's guidance in *State Farm*, the district court found that Reyes' conduct in failing to translate the consent-to-search form and illegally detaining Mendez at the police station was not so reprehensible as to justify the jury's award of punitive damages. The court noted, among other things, that although the jury found that Reyes acted with reckless disregard for Mendez's rights, there was no evidence that he acted with malice. Accordingly, on the range of reprehensible conduct identified by the Supreme Court, the district court found that "Reyes' conduct was closer to mere accident than it was to malice." The court also found, and Mendez now concedes, that there is no evidence that Reyes had acted in the same manner on any other occasion, thus making this the kind of "isolated incident" the Court found less reprehensible than repeated conduct. *State Farm*, 538 U.S. at 419. Reyes' conduct lastly did not pose any risk to Mendez's bodily health or safety. Although the injury here was physical and emotional rather than economic, the district court noted that the jury's award of nominal damages ulti-

mately indicated that "the harm caused by Reyes' conduct was minimal."

**[4]** Although Mendez concedes that not all the reprehensibility factors point in her favor, she argues that Reyes' conduct was nonetheless reprehensible because of its recklessness and because Mendez, while not financially vulnerable, was particularly vulnerable to the kind of constitutional deprivation she suffered here. We agree with other courts that abuses of police power not involving actual violence are still reprehensible, insofar as they involve an illegal exercise of authority "backed by the weight and force of state power." *Lee v. Edwards*, 101 F.3d 805, 810 (2d Cir. 1996). We certainly do not approve of Reyes' having deliberately and illegally withheld relevant information from Mendez and pressuring her to sign the consent-to-search form, knowing that she was reluctant to agree and was not fully aware of her rights. Nonetheless, the district court's findings of fact as to the reprehensibility of Reyes' conduct were not clearly erroneous. The degree of reprehensibility therefore weighs against the jury's substantial punitive damages award here.

**[5]** Under the second *Gore* guidepost, we look to the ratio between the punitive damages and the actual harm inflicted on the plaintiff. 517 U.S. at 580. In this case, because Mendez was awarded only nominal damages, the award of $250,000 in punitive damages — which represents a ratio of 125,000 to one — is obviously considerably in excess of the single-digit ratios the Court has deemed "more likely to comport with due process" than higher ratios. *See State Farm*, 538 U.S. at 425. The Court, however, has carved out an exception relevant to this case, which is that "ratios greater than those we have previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages." *Id.* (internal quotation marks omitted). Constitutional torts such as Mendez's are far more likely to present such scenarios. Ratios in excess of single digits in § 1983 suits therefore will not generally violate due process

when the victim suffers no compensable injury. If we were to hold otherwise, then "*any* appreciable exemplary award would produce a ratio that would appear excessive by this measure." *Lee*, 101 F.3d at 811. This would conflict with the Court's clear guidance that punitive damages should remain available under § 1983 even in the absence of a compensable injury, and that in such situations "punitive damages may be the only significant remedy available." *Smith v. Wade*, 461 U.S. 30, 55 n.21 (1983) (internal quotation marks omitted).

**[6]** The district court did not rule otherwise, however, and awarded Mendez $5,000 in punitive damages — a ratio of 2,500 to one, which is also significantly in excess of single digits. The district court firmly rejected the County's suggestion that the only punitive damages award that would comport with due process would be an $18 award, noting that such a small award would not be "sufficient to deter other law enforcement officers from engaging in similar conduct in the future." Although we agree that the second *Gore* guidepost may have reduced relevance in § 1983 suits involving only nominal damages, we do not agree with Mendez's contrary suggestion that this factor has *no* relevance. In this case, the jury awarded a staggering $250,000 in punitive damages, even though the jury found that Mendez suffered no compensable injury from Reyes' actions. While the second *Gore* guidepost may not be dispositive of the excessiveness of the award in this case, the great disparity between the actual and punitive damages does not cut in Mendez's favor.

Under the final *Gore* guidepost, we compare the punitive damages award in this case to any civil or criminal penalties authorized or imposed in comparable cases. 517 U.S. at 583-84; *see also State Farm*, 538 U.S. at 428. Other circuits have placed greater emphasis on this factor when a civil penalty was readily available as a yardstick of reasonableness and actual damages in the case were nominal or small. In cases involving illegal discrimination under the Fair Housing Act, for example, courts of appeals have upheld punitive damage

awards of approximately $50,000 despite small actual damage awards, in part because this amount roughly equaled the civil penalty available for these violations. *See, e.g.*, *Lincoln v. Case*, 340 F.3d 283, 294 (5th Cir. 2003); *United States v. Big D Enters.*, 184 F.3d 924, 933 (8th Cir. 1999). Mendez, however, identifies no civil penalty available under law for violations of constitutional rights, nor has she identified any comparable cases in which a civil penalty of $250,000 was imposed for the kind of conduct Reyes engaged in here. Accordingly, this factor provides no guidance in assessing the constitutionality of the award.

**[7]** Considering all of the *Gore* guideposts, we conclude that the jury's award was unconstitutionally excessive in violation of due process and therefore properly remitted by the district court. Because the punitive damages award was excessive under the Due Process Clause, we need not decide whether it was also excessive as a matter of federal common law. *See Exxon Shipping Co. v. Baker*, 128 S. Ct. 2605, 2626-27 (2008). Constitutional torts are governed by the federal common law, subject to the authority of Congress to legislate otherwise. *See Smith*, 461 U.S. at 34 (holding that damage remedies in § 1983 suits are determined by looking "first to the common law of torts (both modern and as of 1871)"). In *Exxon Shipping*, the Court held that the federal common law of maritime torts should contain "more rigorous standards than the constitutional limit" on punitive damage awards, and concluded that "a 1:1 ratio, which is above the median award, is a fair upper limit." *Id.* at 2629, 2633. Any attempt to fashion a federal common law rule of reasonableness for punitive damage awards for constitutional torts, however, would have to make "such modification or adaptation [to the common law] as might be necessary to carry out the purpose and policy" of § 1983. *Smith*, 461 U.S. at 34. We decline to make any such rules here, when we agree that the award was excessive as a matter of due process. We therefore affirm the district court's remittur.

### III. Summary Judgment on the State Law Negligent Training Claim

[8] Mendez contends that the district court erred in granting summary judgment to the County on her state law negligence claim for failing to train police officers on how to legitimately obtain the consent of individuals brought to the police station. Under California law, a public entity generally is immune from suit for injuries arising from acts or omissions of the entity or its employees. *See* Cal. Gov't Code § 815(a). California law creates an exception, however, in cases where the public entity is "under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury," and the public entity is liable for causing that kind of injury while failing to exercise reasonable diligence in discharging its duty. *See* Cal. Gov't Code § 815.6. The district court granted summary judgment to the County, concluding that the plaintiffs had "present[ed] virtually no evidence regarding the County's training of its deputies." We review the district court's grant of summary judgment de novo. *Davis v. City of Las Vegas*, 478 F.3d 1048, 1053 (9th Cir. 2007). We affirm.

The County first argues that it is immune from suit under California Government Code § 815(a), because no statute creates a mandatory duty of care as to the training of its employees. As the County admits, however, it makes this argument for this first time on appeal, after having conceded before the district court that it was under a duty to train its employees adequately, and arguing instead that it *satisfied* that duty. We decline to address the County's new theory of defense because it was not presented to the district court. *See Wagner v. Prof'l Eng'rs in Cal. Gov't*, 354 F.3d 1036, 1044 n.4 (9th Cir. 2004) ("Generally, before an argument will be considered on appeal, the argument must be raised sufficiently for the trial court to rule on it.") (internal quotation marks omitted); *see also In re Bliemeister*, 296 F.3d 858, 861

(9th Cir. 2002) ("Sovereign immunity . . . . may be forfeited where the state fails to assert it.").

**[9]** Although we reject the County's immunity defense, we nonetheless affirm the district court because we agree that Mendez did not create a triable issue of fact as to whether the County failed to satisfy its statutory duty of care. Mendez argues that the guidelines and regulations that create the County's duty to train its employees are California's Peace Officer Standards and Training ("POST") regulations, which are promulgated under California Penal Code § 13510. These rules establish "minimum standards for training of city police officers" and other peace officers in California. *See* Cal. Penal Code § 13510(a). Mendez presented no evidence, however, that the County negligently failed to comply with the POST regulations on training. Instead, she focused on showing that the County did not train its employees on how to obtain "implied consent" from a witness and offered the testimony of an expert witness from the Detroit Police Department, who asserted that an adequate training program should include training on obtaining implied consent. None of this evidence established that the POST regulations or any other statute create a duty to train employees on implied consent or that the County negligently failed to fulfill that duty. We affirm.

## IV.   Mendez's Request for Attorney's Fees and Costs

After the jury's verdict in her favor, Mendez moved for attorney's fees and costs under 42 U.S.C. § 1988. Section 1988(b) authorizes the district court to award the prevailing party "a reasonable attorney's fee" in any suit to enforce the provisions of 42 U.S.C. § 1983. As the Supreme Court has noted, "[t]he purpose of § 1988 is to ensure 'effective access to the judicial process' for persons with civil rights grievances." *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983) (quoting H.R. Rep. No. 94-1558, p. 1 (1976)). Therefore, "a prevailing plaintiff should ordinarily recover an attorney's fee unless special circumstances would render such an award

unjust." *Id*. (internal quotation marks omitted). Although a district court's award of attorney's fees is generally reviewed for abuse of discretion, "we only arrive at discretionary review if we are satisfied that the correct legal standard was applied and that none of the district court's findings of fact were clearly erroneous." *Thomas v. City of Tacoma*, 410 F.3d 644, 647 (9th Cir. 2005). The district court acknowledged that Mendez was a prevailing plaintiff and therefore was ordinarily entitled to a reasonable attorney's fee, but nonetheless denied her request for costs and fees in its entirety, finding that her request was "so excessive that [it] warrant[s] a denial of fees altogether." Mendez argues that the district court erred by denying her all costs and fees. We agree, and so we reverse and remand for a determination of reasonable costs and fees.

## A.

Following the jury's verdict, Mendez moved the district court for an award of fees in the amount of $727,558, attaching supporting affidavits and other documentation to her motion. Mendez was represented by attorneys from the law firm Morrison & Foerster, LLP. An affidavit from her lead counsel explained that counsel had spent 2,570 hours preparing for and trying her case, excluding hours that were spent pursuing her unsuccessful *Monell* claim against the County and the claims Mendez voluntarily dismissed. Mendez requested that the two partners who worked on her case be compensated at between $450 and $550 per hour, which was the typical rate at which they billed their clients at that time. Mendez asked that the two associates who primarily worked on the case be compensated at rates between $250 and $300 per hour, which was somewhat below their usual market rate. Mendez's counsel stated that the final fee request was calculated after voluntarily discounting the partners' hours by 10 percent and the associates' and paralegals' hours by 20 percent, "in order to address any concerns that the Court or the defendants may have that on any given day or task, any person may have devoted too much time to any particular proj-

ect, or to alleviate any concerns that the rates sought are too high." Lastly, Mendez stated that she had incurred more than $80,000 in costs, but was requesting only $70,000, again in an attempt to avoid disputes over the propriety of particular costs.

The County did not contest Mendez's entitlement to attorney's fees and costs under § 1988, but did object to certain hours it deemed excessive and certain costs it found objectionable. In calculating an appropriate fee award for Mendez, the County proposed that 1,999 hours of work were reasonably expended on the case. After reducing the partners' and associates' billing rates to $300 and $150 per hour respectively — which the County considered more reasonable rates for civil rights work — the County suggested that $390,225 in fees were reasonably incurred. The County asked the court to reduce this figure by 75 percent, however, based on what it argued was the limited degree of success the plaintiffs had achieved, resulting in a final proposed fee award of $97,556. The County similarly proposed an across-the-board reduction of Mendez's costs by 75 percent, suggesting that the court award no more than $18,009. In reply, Mendez agreed to further reduce certain hours and costs to accommodate the County's specific objections and agreed to a slight reduction in the partners' billing rates, but refused to accept any percentage reduction to the overall costs or fees based on the alleged poor degree of success. Mendez's final request, after adding in additional hours spent working on the case since the motion for attorney's fees was filed, was for $727,307 in fees and $65,000 in costs.

Despite Mendez's success on the merits and the County's acknowledgment that she was entitled to recover what it considered reasonable attorney's fees and costs, the district court denied her request for fees and costs *entirely*. During a hearing on the motion for attorney's fees, the district court called Mendez's request "the most excessive fee request I have ever seen" and told the parties that it believed there was case law

that would support "simply denying the request." The court noted that it did not think Mendez's case was particularly complicated, because it involved no novel issues of constitutional law and the events in question occurred over a relatively short time span. The court also observed that the suit had not achieved any significant success, because the jury awarded Mendez only nominal and punitive damages on two of her claims. The court requested supplemental briefing from the parties to address the possible applicability of *Scham v. District Courts Trying Criminal Cases*, 148 F.3d 554 (5th Cir. 1998), *abrogated on other grounds by Bailey v. Mississippi*, 407 F.3d 684 (5th Cir. 2005), and *Brown v. Stackler*, 612 F.2d 1057 (7th Cir. 1980), two cases where courts of appeals held that a court may deny a request for attorney's fees if it was so excessive as to "shock the conscience." After reviewing the parties' supplemental briefing, the district court entered a minute order denying costs and fees, finding that "the amount requested satisf[ies] the 'shocks the conscience' test." The district court later entered a final written order denying costs and fees, again emphasizing the overall excessiveness of Mendez's request. This appeal followed.

## B.

[10] The County does not dispute that Mendez was a prevailing plaintiff and, as such, would ordinarily be entitled to a reasonable attorney's fee. The jury found in Mendez's favor on three claims against five parties: her two constitutional claims of unreasonable search and false arrest against Reyes, and her state law claim of false arrest against Reyes, the County of San Bernardino, the San Bernardino Sheriff's Department and the City of Hesperia. Even a plaintiff who wins only nominal damages is considered a prevailing plaintiff under § 1988; Mendez won both nominal and punitive damages. *See Farrar v. Hobby*, 506 U.S. 103, 112 (1992). Although she did not prevail against all defendants or on all of her claims, it is well established that "fail[ure] to recover on *all* theories of liability is not a bar to recovery of attorney's

fees." *Thomas*, 410 F.3d at 649. A plaintiff is entitled to recover attorney's fees even for claims on which she did not prevail, if they "involve a common core of facts *or* are based on related legal theories." *Id.* (internal quotation marks omitted). Nonetheless, the district court dispensed with "the practice courts are generally required to follow when calculating attorney's fees in civil rights cases — i.e., computing a lodestar figure and then, if necessary, making adjustments to that figure based upon reasonableness factors," instead denying all costs and fees as excessive. *Morales v. City of San Rafael*, 96 F.3d 359, 362 (9th Cir. 1997).

**[11]** Congress' intent in enacting § 1988 was to attract competent counsel to prosecute civil rights cases, where "victims ordinarily cannot afford to purchase legal services at the rates set by the private market." *City of Riverside v. Rivera*, 477 U.S. 561, 576 (1986) (plurality opinion). Therefore, "a court's discretion to deny fees under § 1988 is very narrow and . . . fee awards should be the rule rather than the exception." *Herrington v. County of Sonoma*, 883 F.2d 739, 743 (9th Cir. 1989) (internal quotation marks omitted). The Supreme Court and we have thus denied a prevailing plaintiff an attorney's fee in only certain limited situations, none of which is applicable here. In *Farrar*, the Court held that a plaintiff who seeks a large damages award but wins only nominal damages, thus failing to prove an essential element of the relief sought, may reasonably be awarded no fees. 506 U.S. at 115. We have explained, however, that such a denial is appropriate only where "the plaintiff's success is purely technical or *de minimis*." *Morales*, 96 F.3d at 363 (internal quotation marks omitted). When, as here, the plaintiff wins punitive damages, the "award of punitive damages alone is sufficient to take it out of the nominal category." *Thomas*, 410 F.3d at 648. The County does not contend that Mendez's victory falls within the *de minimis* exception recognized in *Farrar*.

**[12]** A court may also deny an attorney's fee to the prevailing plaintiff under § 1988 when "special circumstances exist

sufficient to render an award unjust." *Thomas*, 410 F.3d at 648. We evaluate whether special circumstances exist by asking whether "(1) allowing attorney's fees would further the purposes of § 1988 and (2) whether the balance of equities favors or disfavors the denial of fees." *Id*. (internal quotation marks omitted). We have stressed that this exception applies only in unusual cases, however, such as when there is "both a strong likelihood of success on the merits and a strong likelihood of a substantial judgment at the outset of the litigation," such that the purpose behind § 1988 — ensuring that "litigants with similar claims would not be dissuaded from bringing suit by the lack of availability of a fee award" — is not implicated. *Herrington*, 883 F.2d at 745. We have firmly rejected the district court's authority to refuse a reasonable fee under the "special circumstances" exception simply because it believes it "would result in a windfall" to a plaintiff. *Thomas*, 410 F.3d at 648. "Granting a windfall to plaintiffs was a concern echoed by Congress in enacting § 1988, but Congress balanced that concern against the need to attract competent counsel to prosecute civil rights cases." *Id*.

[13] The district court did not identify any "special circumstances" present here, and we see none. Mendez's suit involved precisely the kind of high-risk, low-reward constitutional claims that motivated Congress to enact § 1988. Even the district court remarked that it was unlikely that "anyone was beating down the doors to take on Ms. Mendez's case." The district court itself did not purport to rely on the "special circumstances" exception, but instead denied Mendez's request for costs and fees solely on a legal standard that originates from outside this circuit: that a request for fees under § 1988 may be denied if it is "outrageously excessive" or "inflated to an intolerable degree," *see Brown*, 612 F.2d at 1059, or "so excessive it 'shock[s] the conscience of the court,' " *see Scham*, 148 F.3d at 557 (quoting *Fair Housing Council v. Landow*, 999 F.2d 92, 96 (4th Cir. 1993)) (alterations in *Scham*). As the district court acknowledged, this circuit has never held that a court has the discretion to deny an attorney's

fee to a prevailing plaintiff under § 1988 solely because the court finds the fee request to be so excessive as to shock its conscience.

We need not decide whether it would ever be appropriate for a court entirely to deny fees and costs under § 1988 purely on the excessiveness of the request, however, because those circumstances are not present here. Those courts of appeals that have upheld a denial of fees under the "shocks the conscience" test have done so only where the fee request appeared to have been made in bad faith, such as billing outrageous numbers of hours on simple matters, or where the plaintiff made no effort to eliminate hours spent on unsuccessful, unrelated claims. In the first category are cases such as *Brown*, where the Seventh Circuit denied all fees to an attorney who submitted a request for 800 hours of billable time, even though his work consisted of filing a six-page complaint and then simply awaiting the outcome of pending litigation in the Supreme Court that "almost automatically . . . disposed of" the case. 612 F.2d at 1059. Similarly, in *Scham*, the Fifth Circuit upheld a total denial of fees where an attorney billed 936 hours for a case where "discovery was limited, and there were no meetings of the parties or attorneys, no settlement negotiations, no mediation, no court appearances, and no trial." 148 F.3d at 558. The counsel in *Scham* was also a solo practitioner with one year of experience, who nonetheless requested $750 per hour for his time. *Id.* Therefore, in both of these cases, it was altogether improbable that any attorney could have reasonably expended such hours in good faith on matters so simple.

Falling into the second category are cases such as *Fair Housing Council*, 999 F.2d 92, where the Fourth Circuit upheld a denial of fees to a prevailing plaintiff who made no effort to eliminate large numbers of hours spent on unsuccessful, unrelated claims. In that case, plaintiffs brought separate claims for housing discrimination and breach of contract, succeeding only on their breach of contract claim. *See* 999 F.2d

at 95. Although the housing discrimination and contract claims were not related — and the discrimination claim was by far the more complex of the two to litigate — the plaintiffs nonetheless submitted a request for $537,113 in fees for the *entire* litigation, with billing entries that "failed to allocate the fees attributable to each claim." *Id*. The First Circuit similarly upheld the denial of fees in *Lewis v. Kendrick*, 944 F.2d 949, 957-58 (1st Cir. 1991), where plaintiffs achieved only minor success and yet "made no reduction for claims" that had "no relation" to the victorious claim. The *Lewis* case also appears to have fallen into (and thus anticipated) the *Farrar* exception to granting a fee award, because the First Circuit concluded that plaintiffs' $1,000 compensatory award for prevailing on a single claim — after having requested $300,000 in compensatory and punitive damages on multiple claims — constituted only a "de minimis" victory. *Id*. at 955. As explained above, Mendez's case does not come within the *Farrar* exception.

[14] Although the district court characterized Mendez's fee request as "unreasonable," "excessive," "egregious," "staggering" and "indefensible," there is no evidence that her fee request was either made in bad faith or contained excessive hours spent on unrelated claims. The County's own proposed lodestar calculation included almost the same number of billable hours as Mendez's request, an acknowledgment that this case involved considerable discovery and proceeded to a full trial.[1] The County suggested that Mendez's attorneys should be compensated at a significantly lower rate — approximately half of what Mendez requested — but the County did not deny that Mendez's attorneys typically charge their clients such amounts. Instead, the County simply argued that her

---

[1]Mendez's initial request reflected 2,570 hours of attorney time, which after the 10 and 20 percent write-downs for partners and associates respectively, amounted to approximately 2,144 hours. The County, in response, suggested 1,999 hours were reasonably incurred. In reply, Mendez agreed to write off an additional 17.5 hours, thus bringing the two sides' calculation of hours within a margin of approximately six percent.

attorneys should be compensated in line with civil rights attorneys and not their own usual hourly rate. *Cf. Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980-81 (9th Cir. 2008) (explaining that appropriate hourly rate is "the prevailing hourly rate in the [court's district] for work that is similar to that performed in [the] case, by attorneys with the skill, experience and reputation comparable" to the party's attorneys). Finally, Mendez's attorneys represented that they had eliminated hours spent on Mendez's unsuccessful, unrelated claims. Although the County identified a few hours that it believed were nonetheless related to these claims, there is nothing to suggest that Mendez failed to make a good-faith effort to eliminate unrelated hours. In her reply, Mendez also agreed to write off additional time and costs so as to reduce or eliminate any remaining disputes over the number of hours. Thus we see nothing in this request for fees and costs that would "shock the conscience" of the court, such as was present in cases like *Scham*, *Brown*, *Lewis* and *Landow*.

The other reasons the district court offered in support of its decision likewise cannot justify denying fees entirely. The court emphasized first that the fee request was "staggering in light of the issues prevailed upon at trial and the actual amount of damages recovered by Plaintiff." We give due weight to the court's first-hand assessment of the case and its dynamics, both legal and factual. Nonetheless, we have cautioned that the significance of civil rights suits should not be evaluated solely on the amount of damages obtained, because successful suits act as a deterrent to law enforcement and "serve[ ] the public purpose of helping to protect [the plaintiff] and persons like him from being subjected to similar unlawful treatment in the future." *Morales*, 96 F.3d at 364-65. Even in a case where the "[p]laintiff succeeded on only one of his many claims against Defendants," we held that the district court must nonetheless calculate a reasonable fee. *Thomas*, 410 F.3d at 649-50. The district court certainly has discretion to reduce an award to a plaintiff who achieved only partial or limited success. But "[t]o deny an award of attor-

ney's fees notwithstanding Plaintiff's clear victory on one of his claims for relief is an abuse of discretion: a reasonable fee . . . is *not* no fee at all." *Id.* at 649.

The district court also suggested that the denial of fees could be justified because of certain excessive hour and cost entries and because Mendez's counsel "block-billed" their time, "thereby frustrating the Court's efforts to determine whether the fees were, in fact, reasonable."[2] Again, such billing practices are legitimate grounds for reducing or eliminating certain claimed hours, but not for denying all fees. *See, e.g.*, *Welch v. Met. Life Ins. Co.*, 480 F.3d 942, 948 (9th Cir. 2007) (courts have discretion to reduce block-billed hours); *Herrington*, 883 F.2d at 747 (courts have discretion to eliminate hours attributable to "duplication of effort"). Even duplicative work, however, is not a justification for cutting a fee, unless "the lawyer does *unnecessarily* duplicative work." *Moreno v. City of Sacramento*, No. 06-15021, ___ F.3d ___, 2008 WL 2875300 at *3 (9th Cir. July 28, 2008). As noted above, Mendez and the County essentially agreed on the number of hours reasonably expended on the case. Nonetheless, the district court often emphasized the excessiveness of Mendez's fees and costs as initially *recorded* in the firm's billing records — which showed approximately $1.2 million in fees and $85,000 in costs — even though Mendez never actually *requested* these amounts but instead voluntarily reduced both fees and costs, ostensibly to account for inefficient work or disputable cost entries.[3] The district court thus

---

[2]"Block billing is the time-keeping method by which each lawyer and legal assistant enters the total daily time spent working on a case, rather than itemizing the time expended on specific tasks." *Welch v. Met. Life Ins. Co.*, 480 F.3d 942, 945 n.2 (9th Cir. 2007) (internal quotation marks omitted).

[3]The district court questioned certain cost entries it deemed inappropriate, such as $5 spent on aspirin, $66.58 in "overtime meals" during trial, $419.72 for "meals, lodging, games, and telephone for Angel Mendez," $1,857.30 in travel costs for one of Mendez's attorneys and $71.88 for

appears to have penalized Mendez for alleged inefficiency, notwithstanding her attempt to write down hours and costs to account for those very inefficiencies. As for the block-billed time entries, it was fully appropriate for the court to reduce those claimed hours. *See Welch*, 480 F.3d at 948 (affirming court's discounting of block-billed hours because they may overstate the hours incurred and make it "more difficult to determine how much time was spent on particular activities"). As we have clarified since the district court was confronted with the fee request here, however, the use of block billing does not justify an across-the-board reduction or rejection of *all* hours. *See id.*

**[15]** On remand, the district court should determine a reasonable attorney's fee for Mendez utilizing the customary lodestar method. *See, e.g., Morales*, 96 F.3d at 363. The "lodestar" is the presumptively reasonable rate, which is reached by multiplying the number of hours reasonably expended by the prevailing party with a reasonable hourly rate, then making any adjustments as necessary to account for factors not already subsumed within the initial lodestar calculation. *See id.*; *see also Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975) (explaining 12 factors that bear on the reasonableness of the fee). In so doing, the court may make the adjustments it finds are warranted based on the

---

office supplies. Even if all of these cost entries were inappropriate, in total they accounted for less than the amount that Mendez had already voluntarily agreed to forgo, even before receiving the County's objections. We agree that Mendez should have cleansed her own records of inappropriate entries, such as the "red-flag" aspirin charge, rather than merely taking an amount off the top, and the district court might have reasonably reduced her award accordingly. Nonetheless, Mendez's perhaps clumsy effort to account for inappropriate costs or inefficient hours suggests she was trying to act in good faith. *See Moreno*, 2008 WL 2875300 at *2-3 (noting that counsel's own effort to "cut her fees by 9 percent" should inform district court's determination of whether the hours spent or fee requested were excessive).

record before it. For example, the court must consider what constitutes a reasonable hourly rate for work performed in the relevant community by attorneys of similar skill, experience and reputation. *See Camacho*, 523 F.3d at 980-81; *see also Herrington*, 883 F.2d at 746 (noting that "[a] reasonable hourly rate should reflect the cost of competent counsel in the field"). The court may also reduce an award for attorney's fees for unnecessarily duplicative work, if the court provides "a clear explanation that we can review" as to why these hours were truly unnecessary. *See Moreno*, 2008 WL 2875300 at *3. At the same time, the district court is "not only free but obligated to consider 'the results obtained' by [Mendez], or the 'extent of [her] success.' " *Morales*, 96 F.3d at 364 (quoting *Hensley*, 461 U.S. at 436, 440). We therefore vacate the district court's order denying Mendez all fees and costs and remand for a determination of a reasonable award, consistent with the principles we have explained.

## V.    Sanctioning Mendez's Counsel for Failure to Appear

After trial, the district court imposed a $500 sanction personally on one of Mendez's attorneys, Arturo J. Gonzales**,** Esq., for failure to appear at an order to show cause hearing. The local rules for the Central District of California expressly reserve the district court's "inherent power to maintain control over the proceedings conducted before said judge," and state that "[m]isconduct of any attorney in the presence of a court or in any manner in respect to any matter pending in a court may be dealt with directly by the judge in charge of the matter." C.D. Cal. L.R. 83-3.1.12. Although the district court did not specify the authority for its order, "we can deduce the source of its power for purposes of our review," and in this case it is clear that the court sanctioned Gonzales in an exercise of its inherent power to "protect[ ] the due and orderly administration of justice and maintain[ ] the authority and dignity of the court." *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997) (internal quotation marks omitted) (alterations in original). We review the district

court's entry of sanctions for abuse of discretion. *See id.* With respect, we must conclude that the district court abused its discretion by imposing the sanction without making an express finding of bad faith, and by sanctioning Gonzales for failing to appear at a hearing when he did not have notice that his personal appearance was required. We therefore reverse and vacate the sanction order.

## A.

The genesis of the sanctions came during trial, when the district court admonished Gonzales for seeming to repeat a question during his examination of a hostile witness, after the court had ruled the question argumentative.[4] Once the jury was dismissed, the court said it was inclined to cite Gonzales for contempt for having disobeyed its ruling sustaining the objection. The court asked Gonzales to respond in papers by the following Monday, but told him that "[a]t this point there's an [order to show cause] re sanctions for contempt set for the end of trial." In his declaration, Gonzales explained that he is a partner at Morrison & Foerster and chair of his firm's Trial Practice Group, with 20 years of litigation experience before federal and state courts. He explained that when

---

[4]The relevant exchange occurred during Gonzales' examination of Reyes:

| Gonzales: | And how long would it take for you to read these few lines in Spanish? |
| --- | --- |
| Reyes: | Not long at all. |
| Gonzales: | Then why didn't you do it? |
| Reyes: | I didn't. |
| Gonzales: | I know you didn't. Why not? |
| [Defense counsel]: | Argumentative, your honor. |
| Court: | Counsel, it's argumentative. |
| Gonzales: | Why didn't you do it? Why didn't you read these three lines in Spanish? |

a trial objection is sustained, it is his practice to make a "quick and good faith judgment call" on how to rephrase the question so as to elicit the desired information in a way that is not objectionable. In this case, he believed he had done so by removing the argumentative aspect from the objectionable question, and noted that defense counsel did not object to the reformulated question.

The court did not respond to Gonzales' declaration, but approximately two weeks later, when setting a date for argument on various post-trial motions, advised counsel that the hearing would include argument on "OSC's" as well.[5] On the date of that hearing, Tony West, Gonzales's co-counsel and partner from Morrison & Foerster, appeared but Gonzales did not. In response to the court's question about Gonzales' absence, West said Gonzales was available by telephone if the court had any questions that were not adequately addressed by his declaration, but that Gonzales had "a longstanding commitment that he could not easily get out of," teaching a legal practice course. West averred that Gonzales "has every confidence in my ability to represent him," to which the district court replied, "technically, the contempt is against him; therefore, I'm not sure you represent him." The district court did not resolve the contempt citation at this hearing, but two days later issued a second order to show cause, this time regarding Gonzales' failure to appear at the hearing.

Gonzales submitted a further declaration in response to the second order to show cause and also personally appeared at a hearing held three weeks later. The court expressed its view that a contempt citation "is addressed not to the party, but to

---

[5]Before trial, the district court had also entered an order to show cause against both parties for having failed to participate in a settlement conference with the magistrate judge prior to a court-ordered deadline. Gonzales was not directly involved in this incident, and the court ultimately found that the parties had complied with the spirit of its order by holding settlement talks before a third-party mediator.

the counsel personally," and that therefore "Mr. West could not purport to represent you personally." The court suggested that even Gonzales' own declarations were not properly filed with the court because he had not entered his own appearance in pro per. Gonzales told the court that he was "surprised to learn, if it indeed is the case, that when a court makes a request, such as the court did, that a lawyer has to actually either obtain counsel or make a formal appearance in pro per. Just never knew that, to be candid with you." Gonzales explained that he did not appear at the previous hearing because he thought his declaration would satisfy the court and that it would be best for West to represent him. At the end of the hearing, the court decided not to cite Gonzales for contempt based on his repetition of the question during trial examination. The court did, however, impose a $500 sanction personally on Gonzales for failure to appear at the order to show cause hearing, stating that the court found it "difficult to understand how you could not believe that on a contempt you would be required to be here." Gonzales paid the sanctions directly to the court and brought this appeal.

## B.

The district court's authority to impose sanctions under its inherent powers is broad, but not limitless. "Before awarding sanctions under its inherent powers . . . the court must make an explicit finding that counsel's conduct 'constituted or was tantamount to bad faith.' " *Primus*, 115 F.3d at 648 (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980)). A finding of bad faith may be appropriate when, among other things, a party engages in behavior that has the effect of "delaying or disrupting the litigation or hampering enforcement of a court order." *Id.* at 649 (internal quotation marks omitted). We have emphasized, however, that "[t]he bad faith requirement sets a high threshold." *Id.* Even in a case where the district court described a litigant's arguments as "totally frivolous," "outrageous" and "inexcusable" and called his behavior "appall[ing]," we nonetheless refused to equate this

characterization of conduct as synonymous with a finding of bad faith. *See id*. Here the district court said only that it found it "difficult to understand" that Gonzales would not have known his personal appearance was required. This does not suffice as a finding of bad faith, nor is this a case where "bad faith is so patent that we will infer the necessary finding." *Id*.

We are also troubled by the district court's failure to give Gonzales notice that his personal appearance was required at the first order to show cause hearing. A district court may not sanction an attorney under its inherent powers if there is nothing in the local rules or norms of professional conduct "which would have placed [the attorney] on reasonable notice" that his conduct was not in conformance with the court's requirements. *See In re Richardson*, 793 F.2d 37, 40 (1st Cir. 1986). Although the district court suggested that the contempt proceeding was an entirely separate action such that Gonzales should have known to enter a formal appearance of counsel on his behalf, courts frequently impose sanctions against clients as well as attorneys for their counsel's misbehavior before the court. *See, e.g.*, *Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1107 (9th Cir. 2005) (explaining that the district court imposed monetary sanctions against both client and attorney for counsel's bad faith actions). Earlier in the litigation, the court had in fact issued to both sides an order to show cause for sanctions for a possible violation of a court order regarding a settlement conference. *See n.5 supra*. That OSC did not purport to run against any of the attorneys personally, although individual attorneys might have been to blame for any error.

Accordingly, Gonzales could reasonably have believed — before being informed otherwise by the court — that the order to show cause was not necessarily a separate action against him *personally*, such as to require him to obtain his own counsel and to appear himself. With this understanding, it would not have been unreasonable for him to believe he could rely on another member of his trial team who was appearing

to argue the other post-trial motions in Mendez's case. To the extent the district court was focused on punishing Gonzales for his trial misbehavior, it was incumbent on the court to give him fair notice of that personal exposure and obligation to appear in person. *See generally F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1137-39 (9th Cir. 2001) (discussing levels of due process required in contempt and sanctions proceedings). Although we agree that Gonzales should have, as a matter of good practice and courtesy, either attended the hearing or informed the court of his unavailability, we cannot find that the court's orders unambiguously communicated to Gonzales that his presence was necessary and his co-counsel could not represent him. Absent such notice, Gonzales could not have acted intentionally and in bad faith to circumvent the court by failing to appear at the first OSC hearing.

**[16]** We recognize that district courts enjoy "broad power" to award sanctions against attorney misconduct and that it is important for courts to have sufficient tools to control the behavior of litigants in their courtrooms. *See Primus*, 115 F.3d at 649. Nonetheless, the Supreme Court has cautioned that "[b]ecause inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion." *Roadway Express*, 447 U.S. at 764. "Sanctions not only may have a severe effect on the individual attorney sanctioned," potentially damaging the attorney's career, reputation and livelihood, but they "also may deter future parties from pursuing colorable claims." *Primus*, 115 F.3d at 650. Because the district court did not make a bad faith finding before imposing sanctions, and the record does not support such a finding, we must reverse and vacate the sanction order.

## VI. Request for Reassignment on Remand

**[17]** Lastly, Mendez asks that we reassign this case to a different judge on remand, a remedy she concedes is warranted only under "unusual circumstances." *United States v. Sears,*

*Roebuck, & Co., Inc.*, 785 F.2d 777, 780 (9th Cir. 1986) (per curiam). We have authority to reassign as an exercise of our inherent authority and authority under statute, and may reassign even in the absence of any "actual bias on the part of the judge" who first heard the case. *See id*. at 779-80. The factors we consider in reassigning a case are

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously[ ] expressed views or findings determined to be erroneous based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Id*. at 779 (internal quotation marks omitted). None of these factors justifies reassignment here. As is indicated by these three consolidated cases, Mendez disagreed with a number of the district court's rulings, but this is hardly uncommon over the course of lengthy litigation and trial. Because there are no unusual circumstances warranting reassignment, we see no reason to remand to a different judge.

## CONCLUSION

Mendez's appeal from final judgment, case number 07-56029, is **AFFIRMED**. Mendez's appeal from the order denying her attorney's fees and costs, case number 06-56424, is **REVERSED AND REMANDED**. Mendez's appeal from the order of sanctions against her attorney, case number 05-56118, is **REVERSED AND VACATED**. Each party shall bear its own costs on appeal.