# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-2976

_____

| | | |
|---|---|---|
| George Williams, | * | |
| | * | |
| Appellee, | * | |
| | * | |
| v. | * | Appeal from the United States |
| | * | District Court for the Western |
| ConAgra Poultry Company, | * | District of Arkansas. |
| | * | |
| Appellant. | * | |
| | * | |
| _____ | * | |
| | * | |
| Equal Employment Advisory Council, | * | |
| | * | |
| Amicus on Behalf of Appellant. | * | |

_____

Submitted: May 10, 2004
Filed: August 6, 2004 (Corrected: 08/11/04)

_____

Before MORRIS SHEPPARD ARNOLD, McMILLIAN, and MELLOY, Circuit
Judges.

_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

This is an employment discrimination case in which George Williams, who is black, claimed that his employer, ConAgra Poultry Company, subjected him to a hostile work environment and terminated his employment based on his race. Following a jury trial in the district court, judgment was entered for Mr. Williams on

both claims. ConAgra maintains on appeal that the district court erred in admitting certain evidence, failing to grant judgment as a matter of law, allowing the jury to consider the matter of punitive damages, and refusing to remit punitive damages that are unconstitutionally high. We affirm the judgment except on the matter of punitive damages.

## I.

For many years, Mr. Williams worked in the El Dorado, Arkansas, poultry factory of ConAgra, first as an ordinary employee and later as a supervisor. After he quarreled with one of his supervisors and a co-worker, ConAgra fired him. The company asserted that Mr. Williams was fired for fighting with the co-worker. Mr. Williams believed that his firing was racially motivated and that he had been subjected to a hostile work environment, and he filed a charge with the Equal Employment Opportunity Commission (EEOC). After receiving a right-to-sue letter from the EEOC, he filed this action claiming violations of Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e through 2000e-17), 42 U.S.C. § 1981, and the Arkansas Civil Rights Act (Ark. Code Ann. §§ 16-123-101 through 16-123-108).

Before Mr. Williams's suit, John Johnican had successfully sued ConAgra for employment discrimination. In Mr. Williams's action, ConAgra made a motion *in limine* to exclude all evidence relating to Mr. Johnican's suit. The district court ruled that Mr. Williams could not introduce any evidence regarding the *Johnican* verdict, but it withheld judgment on the admissibility of testimony relating to the events that formed the basis of Mr. Johnican's suit. At trial, ConAgra's management denied that Mr. Williams's firing was racially motivated and that he suffered from a hostile work environment. Mr. Williams's witnesses testified to the incidents leading up to Mr. Williams's firing, as well as to numerous incidents of racially motivated harassment and disparate treatment of black employees, including incidents that formed a part of the earlier *Johnican* suit. Mr. Williams also testified about his firing and the harassment that he had personally suffered from.

At the end of Mr. Williams's case and again at the close of evidence, ConAgra moved for judgment as a matter of law, which the district court denied. The jury then found for Mr. Williams on both claims, awarding him $927,788.90 in compensatory damages and $6,063,750 in punitive damages on the termination claim, and awarding him $1,001,397.40 in compensatory damages and $6,063,750 in punitive damages on the hostile work environment claim. ConAgra moved to set the verdicts aside and to remit the damages. The district court refused to set the verdicts aside, but it did remit the compensatory damages for the termination claim to $173,156 and the punitive damages on the same claim to $500,000. On the harassment claim, the court remitted the compensatory damages to $600,000 but let the exemplary damages award stand. Although it is not clear from the record, we assume that these awards were made under § 1981, which does not include the caps on damages contained in Title VII and the Arkansas Act.

## II.

ConAgra maintains that the district court erred in admitting certain evidence at trial. Employees at the El Dorado plant testified to numerous instances of racist remarks by fellow employees and managers. In addition, they testified to more threatening actions, such as nooses left at the work stations of black employees, a black doll hung by a noose in the factory, and invitations extended to black employees to attend Ku Klux Klan (KKK) hunting parties where they would be the hunted. A black female employee testified that when black female employees responded favorably to sexually suggestive remarks by managers, they were given the longer breaks typically allowed white employees, but when they failed to respond favorably, they were required to take the shorter breaks allowed black employees. Finally, one black female employee testified to being physically manhandled by a production supervisor with such force that she required medical treatment.

ConAgra points out that nothing in Mr. Williams's testimony indicates that he was aware of any of these activities, and the Supreme Court has stated that an

-3-

actionable harassment claim requires a showing that the workplace was subjectively hostile, *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21-22 (1993). Because a subjectively hostile environment is one that by definition the plaintiff is aware of, a plaintiff cannot recover for harassment of which he or she is unaware. Hence, none of this testimony would be relevant to the question of whether Mr. Williams suffered from an actionable hostile work environment. *See* Fed. R. Evid. 401, 402. As the Seventh Circuit has observed, "Mean-spirited or derogatory behavior of which a plaintiff is unaware, and thus never experiences, is not 'harassment' of the plaintiff (severe, pervasive, or other)." *Mason v. Southern Ill. Univ.*, 233 F.3d 1036, 1046 (7th Cir. 2000); *cf. Carter v. Chrysler Corp.*, 173 F.3d 693, 701 n.7 (8th Cir. 1999).

But it does not follow from the fact that the testimony was irrelevant to whether Mr. Williams's environment was actionable that the court erred in admitting it. In the first place, we think that the testimony made more credible Mr. Williams's testimony about the environment that he was exposed to. In addition, at trial Mr. Williams maintained (and ConAgra denied) that his firing was racially motivated. Evidence of widespread toleration of racial harassment and disparate treatment condoned by management was relevant to its motive in firing Mr. Williams. We believe that evidence of racial bias in other employment situations could permissibly lead to the inference that management was similarly biased in the case of Mr. Williams's firing. Furthermore, Mr. Williams alleged that part of the motivation for firing him was that he had complained about the racially hostile environment at the plant and that management wished to silence him in order to avoid addressing the issue. Evidence of the extent of the hostile environment was thus probative on the matter of managerial motives. *See Estes v. Dick Smith Ford, Inc.*, 856 F.2d 1097, 1102-03 (8th Cir. 1988). Furthermore, as we discuss below, the issue of motive was relevant to Mr. Williams's eligibility for punitive damages on his harassment claim, *see Kolstad v. American Dental Ass'n*, 527 U.S. 526, 538 (1999), even if the conduct of which he was unaware was not relevant to the question of whether he experienced actionable

-4-

harassment. Hence, we conclude that the district court did not err in admitting this testimony.

## III.

ConAgra next argues that Mr. Williams's hostile work environment claim fails as a matter of law. We hold that it does not. On review, we give great deference to a jury's findings. We therefore "view the facts in the light most favorable to the verdict, assuming that the jury resolved all evidentiary conflicts in favor of the prevailing party," in this case Mr. Williams. *Robinson v. Hager*, 292 F.3d 560, 563 (8th Cir. 2002). In order to prevail on a harassment claim, a plaintiff must show that he or she is a member of a protected group, that there was "unwelcome harassment," that there was a causal nexus between the harassment and membership in the protected group, and that the harassment affected a term, condition, or privilege of employment. *See Palesch v. Missouri Comm'n on Human Rights*, 233 F.3d 560, 566 (8th Cir. 2000). If the harassment comes from non-supervisory employees, the plaintiff must also show that the employer knew or should have known about the harassment but failed to take proper action. *See id.* at 566 & n.5.

ConAgra contends that Mr. Williams did not present evidence of racial harassment that was severe or pervasive enough to affect a term, condition, or privilege of his employment. As we have already noted, actionable harassment must be subjectively offensive. *Harris*, 517 U.S. at 21-22. Accordingly, in considering Mr. Williams's claim we confine ourselves to the harassment that he testified to personally suffering from. In its order denying ConAgra judgment as a matter of law, the district court discussed at length incidents that Mr. Williams did not testify to witnessing or suffering from, arguing that because they occurred in the same factory, Mr. Williams could have been aware of them. Because we believe that there must be some evidence, direct or indirect, showing that the plaintiff was subjectively aware of any harassment upon which his or her claim is based, we examine a narrower slice

-5-

of the record than the district court did in determining whether the harassment that Mr. Williams suffered from was objectively hostile.

At trial, Mr. Williams testified that his supervisor regularly swore at him and berated him in front of other employees. Although there was testimony to the effect that Mr. Williams's supervisor berated everyone, other witnesses (including Mr. Williams) testified that he treated Mr. Williams and other black employees with special scorn. According to Mr. Williams, the supervisor and other ConAgra employees regularly used racially demeaning language around him, and on one occasion the supervisor said that he would "fire [Mr. Williams's] black ass." Mr. Williams also stated that he regularly saw graffiti with racist messages in the men's room at the plant. In addition, Mr. Williams testified that he was singled out to remedy problems created by white employees because he was black, and that there was a pervasive practice of using a double standard for evaluating and disciplining white and black employees. Finally, Mr. Williams testified that he complained to management about this treatment on numerous occasions but no meaningful action was taken.

We have repeatedly emphasized that our civil rights statutes do not create a civility code and that "merely rude or unpleasant" conduct does not create actionable harassment. *See, e.g., Alagna v. Smithville R-II Sch. Dist.*, 324 F.3d 975, 980 (8th Cir. 2003). This case, moreover, does not involve the kind of physically threatening behavior that we have relied on in other cases, *Reedy v. Quebecor Pringint Eagle, Inc.*, 333 F.3d 906, 909 (8th Cir. 2003). But we conclude nevertheless that there was a sufficient record to allow a jury to conclude that Mr. Williams was subjected to an unlawfully hostile environment based on his race. The testimony of Mr. Williams and others was sufficient to establish a nexus between his race and the harassment. Although ConAgra stresses the fact that Mr. Williams testified to only a single racial slur directed at him by the supervisor, the plaintiff and others testified that the supervisor's non-racial profanity and abuse was nevertheless more severe when

directed toward black employees. The degree of the severity of the conduct of the supervisor and other employees is a closer question, but Mr. Williams testified to racially-motivated harassment that had a direct effect on the terms and conditions of his employment, such as work assignments. In addition, he testified that workplace harassment negatively affected his relationship with his wife and children, leading to uncharacteristic exhaustion, hostility, and impatience with family members. Furthermore, Mr. Williams testified that the verbal abuse that he suffered from his supervisor was continuous and extended over several years. We conclude that a reasonable jury could find on the basis of this evidence that Mr. Williams was subjected to actionable harassment.

We conclude that ConAgra's other arguments on this point are without merit.

IV.

ConAgra argues that the district court erred in allowing the jury to consider awarding punitive damages on both the wrongful discharge and the harassment claim. We disagree. The Supreme Court laid out the standard for punitive damages in employment discrimination cases in *Kolstad*, 527 U.S. at 534-46. In that case the court emphasized that it was not necessary that the conduct of the employer be egregious in itself. Rather, the question is whether or not the defendant intentionally discriminated with malice or reckless indifference to the protected rights of the plaintiff. *Id.* at 529-30; *see also* 42 U.S.C. § 1981a(b)(1).

As we noted above, there was substantial evidence of egregious racial harassment at the El Dorado plant, and although Mr. Williams did not testify to being aware of this activity, it could be probative of the state of mind of ConAgra's managers in firing him. Furthermore, at trial there were contradictions in the testimony of ConAgra managers with respect to the basis for Mr. Williams's firing. Thus, in this case the same evidence that the jury used to support its finding of racial

motivation in Mr. Williams's discharge also supports an inference of intentional and malicious conduct by ConAgra.

We also conclude that there was sufficient evidence of reckless indifference to Mr. Williams's federally protected rights for a jury to consider punitive damages on his harassment claim. Mr. Williams testified to repeatedly complaining to upper management about harassment by his immediate supervisor. In *Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 619 (8th Cir. 2000), we held that when the victim of harassment repeatedly complains to various supervisors of harassment and the harassment is not stopped, a submissible case on punitive damages has been made. In that case, the employee complained of harassment to supervisors more than 40 times, but they took action "only once in two years" and then their response was "at best ... half-hearted." *Id.* Analogously, Mr. Williams's complaints to ConAgra about his working environment extended over several years and resulted in no meaningful action on the part of management.

V.

ConAgra asserts that the punitive damages award against it on the harassment claim violated due process. The constitutionality of the award presents a question of law, which we review *de novo*. Applying this standard and the appropriate law, we conclude that the punitive damages award was unconstitutional for three interrelated reasons. First, in upholding the award the district court improperly relied on evidence of misconduct by ConAgra unrelated to Mr. Williams's claim. Second, the punitive damages award is far in excess of what analogous statutes would allow. Finally, the ratio of punitive damages to compensatory damages far exceeds the levels that the Supreme Court has suggested are consistent with due process.

The dominant consideration for assessing the constitutionality of a punitive damages award is the reprehensibility of the defendant's conduct. *See BMW of N. Am. v. Gore*, 517 U.S. 559, 575 (1996). In assessing reprehensiblity, however, it is crucial

that a court focus on the conduct related to the plaintiff's claim rather than the conduct of the defendant in general. In *State Farm Mut. Auto. Ins. Co. v. Cambell*, 538 U.S. 408, 422-23 (2003), the Supreme Court emphasized that courts cannot award punitive damages to plaintiffs for wrongful behavior that they did not themselves suffer. Tying punitive damages to the harm actually suffered by the plaintiff prevents punishing defendants repeatedly for the same conduct: If a jury fails to confine its deliberations with respect to punitive damages to the specific harm suffered by the plaintiff and instead focuses on the conduct of the defendant in general, it may award exemplary damages for conduct that could be the subject of an independent lawsuit, resulting in a duplicative punitive damages award. Where there has been a pattern of illegal conduct resulting in harm to a large group of people, our system has mechanisms such as class action suits for punishing defendants. Punishing systematic abuses by a punitive damages award in a case brought by an individual plaintiff, however, deprives the defendant of the safeguards against duplicative punishment that inhere in the class action procedure.

That does not mean that conduct in other cases is always irrelevant when assessing the defendant's reprehensibility. An incident that is recidivistic can be punished more harshly than an isolated incident. *See State Farm*, 538 U.S. at 423. In determining what constitutes a previous example of the same conduct, however, we must be careful not to let the exception swallow the rule. By defining his or her harm at a sufficiently high level of abstraction, a plaintiff can make virtually any prior bad acts of the defendant into evidence of recidivism. For example, in a slip-and-fall case, a prior instance of negligent misrepresentation could be evidence that the defendant has been repeatedly negligent, or, in a slander case, a prior physical assault by the defendant could become evidence that he or she is a recidivist tortfeasor.

The Supreme Court has therefore emphasized that the relevant behavior must be defined at a low level of generality. "[E]vidence of other acts need not be identical to have relevance in the calculation of punitive damages," *id.*, but the conduct must

be closely related. In *State Farm*, the plaintiff sued because his insurance company refused to settle a lawsuit filed against him by a third party, which resulted in a hefty and avoidable judgment. According to the plaintiff, the insurance company's conduct was part of a larger scheme to limit artificially the pay-outs of valid claims and involved altering records, attempts to bully policy holders into selling personal assets to pay for claims, and the like. The Court, however, held that conduct unrelated to third-party lawsuits could not be properly considered. *Id.* at 423-24. Hence, the recidivist conduct must be factually as well as legally similar to the plaintiff's claim.

In upholding the punitive damages award on the harassment claim, we find that the district court improperly relied on evidence of harassment not suffered by Mr. Williams that was insufficiently similar to his experiences to be evidence of recidivism under the narrow exception set forth in *State Farm*. In particular, the district court relied extensively on the testimony of Mr. Johnican who stated that he saw black dolls hung from nooses around the plant. He also reported invitations to KKK barbecues and seeing a long racist joke about keeping black individuals out of heaven posted in the factory. Another black employee, James Atkins, testified that he was invited on KKK hunting trips, where he was to serve as the hunted. He also testified to seeing nooses left about the factory. Tasha Moore testified that female black employees who responded favorably to sexually suggestive banter were extended the privileges of white employees, while black women who did not respond favorably were, along with other black employees, given less favorable treatment. Mr. Williams never testified to being aware of these events, let alone being the target of similar behavior. We hold that this misconduct is insufficiently similar to that of which Mr. Williams was the object to count as evidence of its recidivist character.

The district court did, however, identify evidence that would fall within the *State Farm* recidivism exception. Mr. Atkins testified that white managers were extended privileges, like travel at company expense, unavailable to black employees. Ms. Moore testified that black employees were given shorter breaks than white

employees. These instances are factually similar to the disparate work assignments that Mr. Williams testified about. Mr. Johnican testified to the widespread use of racist language of the kind that Mr. Williams complained of. Once the evidence has been subject to the winnowing required by *State Farm*, ConAgra's conduct in Mr. Williams's case remains reprehensible, but it is less appalling than the general picture of ConAgra's misconduct that the district court drew.

A second relevant consideration in determining the constitutionality of the punitive damages recovered in this case is the disparity between the punitive damages awarded and the civil penalties assessed in analogous cases. *See BMW*, 517 U.S. at 575; *State Farm*, 538 U.S. at 428. Here we find that the closest analogy to Mr. Williams's harassment claim under § 1981 is a harassment claim under Title VII. With respect to companies with the number of employees that ConAgra has, Congress has capped the total of all damages for future pecuniary losses, nonpecuniary losses, and punitive damages in Title VII cases at $300,000. *See* 42 U.S.C. § 1981a(b)(3). Of course, the damages caps in Title VII cases do not apply to § 1981 actions, and a *per se* rule that in § 1981 actions awards in excess of $300,000 violate due process would allow constitutional questions to turn on congressional judgments. Furthermore, in making the decision to limit damages in Title VII cases, Congress made the implicit judgment not to limit damages in § 1981 cases. Hence it would be inappropriate for the courts simply to extend the Title VII limitations to § 1981 cases under the guise of interpreting the Constitution. But explicit legislative judgments of reprehensibility in analogous situations put parties on notice as to the order of magnitude of retributive sanctions that they can expect for reprehensible activity. In this case, the award of punitive damages alone on the harassment claim was $6,063,750, more than twenty times the Title VII limit. We do not hold that there is any constitutionally required ratio between § 1981 damages awards and the Title VII cap, but so huge a discrepancy when coupled with the other infirmities that we discern in this award is telling and hard to ignore.

-11-

A final important consideration in assessing the constitutionality of the award in this case is the ratio of punitive damages to compensatory damages. Both this court and the Supreme Court have emphasized that due process cannot be expressed in a simple numerical ratio. *See, e.g., BMW*, 517 U.S. at 582-83; *Denesha v. Farmers Ins. Exch.*, 161 F.3d 491, 504 (8th Cir. 1999), *cert. denied*, 526 U.S. 1115 (1999). But one should not overstate the extent of the Court's aversion to ratios. The Supreme Court has observed that a ratio that exceeds single digits pushes the outer limits of constitutionality. *State Farm*, 538 U.S. at 425. It is not that such a ratio violates the Constitution. Rather, the mathematics alerts the courts to the need for special justification. In the absence of extremely reprehensible conduct against the plaintiff or some special circumstance such as an extraordinarily small compensatory award, awards in excess of ten-to-one cannot stand.

Looking at the relevant evidence, we cannot say that ConAgra's conduct toward Mr. Williams was so egregiously reprehensible that it justifies an unusually large award. The punitive damages award upheld by the district court was more than ten times the compensatory award for Mr. Williams's harassment claim after remittitur. Given the evidence set forth in the record, and the standards laid down by the Supreme Court in *State Farm*, we hold that this award violates due process. Mr. Williams's large compensatory award also militates against departing from the heartland of permissible exemplary damages. The Supreme Court has stated that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *State Farm*, 538 U.S. at 425. Mr. Williams received $600,000 to compensate him for his harassment. Six hundred thousand dollars is a lot of money. Accordingly, we find that due process requires that the punitive damages award on Mr. Williams's harassment claim be remitted to $600,000.

## VI.

For the reasons set forth above, we affirm the district court in part and reverse in part, and we remand this case to the district court for entry of an amended judgment consistent with this opinion.

_____