Opinion by Judge O’SCANNLAIN; Partial Concurrence and Partial Dissent by Judge HURWITZ.
OPINION
O’SCANNLAIN, Circuit Judge:
We must decide whether the Constitution permits a six-figure punitive damage award in a sexual harassment suit where the jury awarded no compensatory damages and only one dollar in nominal damages.
I
ASARCO is a large copper mining and refining company. One of its many facilities is the Mission Mine Complex, located in Sahuarita, Arizona, about thirty miles south of Tucson. This facility includes both a mine and a mill, where copper ore is crushed, filtered and refined.
Angela Aguilar began working at the Mission mill facility on December 19, 2005. Including a leave of absence, Aguilar *884 worked at the mill facility until November 8, 2006. During that time, Aguilar alleges that she was subjected to sexual harassment, retaliation, and constructive discharge.
A
The first alleged occurrence of sexual harassment began on March 19, 2006, when Aguilar became a car loader at the filter plant. Her supervisor in this role was Wayne Johnson. Johnson was a large man — 6'2" and about 350 pounds — and according to Aguilar he made it known “at the start” that he was romantically interested in her. Aguilar testified that Johnson asked her out in some fashion “every day” and refused to train or to help her when she rejected him. Aguilar also claimed at trial that Johnson, when she asked for help, would “stand[ ] right on top” of her and press up against her. She claimed that she was afraid that Johnson might rape her.[1]
According to Aguilar, her complaints about Johnson initially fell on deaf ears. She stated at trial that she complained to ASARCO’s Human Resources Department (“HR”) about Johnson’s behavior several times and was told that there “is nothing [ASARCO] could do” and that Aguilar had to “handle it [herself].” The mill manager, Sam Lawrence, acknowledged that Aguilar complained to him about Johnson. Lawrence stated that he told Johnson to end his advances, and a week later, upon learning that Johnson had not stopped, threatened him with disciplinary action and the loss of his job. To “get away from” Johnson, Aguilar eventually bid for, and received, a promotion to another crew, where she started working on April 23, 2006.
B
While Aguilar was working at the filter plant, there was no functioning women’s restroom in the building. ASARCO had rented a portable toilet, a “porta-potty,” for Aguilar’s use. According to Aguilar, immediately after the toilet was put up, it was vandalized with pornographic graffiti directed at her. Even after the toilet was replaced, the graffiti was apparently replicated on the replacement. Aguilar claimed that she reported the graffiti to the HR department, to mill supervisor Gary Schwartzberg, and to mill manager Sam Lawrence. There is no evidence that the situation was promptly remedied and photos show that visible pornographic graffiti remained on the toilet as late as 2007.[2]
C
On June 18, 2006, Aguilar became a rod and ball mill person, which took her from the filter plant to the main mill building. In Aguilar’s crew was Julio Esquivel, a “distributed control systems operator.” Although he was not her direct supervisor, Aguilar reported to him and he maintained some authority over her day-to-day work.
Before Aguilar even had started in her new position, Esquivel warned, “your ass is mine” and told her that he would be spending more time with her than his “lady.” According to Aguilar, Esquivel *885 was often giving her conflicting orders, snapping his fingers at her, telling her to “watch herself,” yelling at her, and threatening her with termination. ASARCO responded to this testimony at trial by attempting to show that, as awful as Esquivel was toward Aguilar, it was not motivated by her sex but instead by his general boorishness.
As a result of Esquivel’s reputation as a “rude bully” who “yelled at everybody,” at least one manager at ASARCO did not feel the need to act in response to Aguilar’s complaints. In July, Aguilar asked for a leave of absence to deal with personal problems relating to the custody of her children. She took that leave in September of 2006 and did not return until November 1st. When she returned, she was placed on a different crew. Aguilar worked four more days and then quit ASARCO for good.
D
On March 21, 2008, Arizona filed suit in Pima County Superior Court against ASARCO on behalf of Aguilar and the state. Aguilar later filed her own suit, alleging sexual harassment under Title VII, retaliation and constructive discharge, relying on the same underlying facts. These proceedings were consolidated and removed to the United States District Court for the District of Arizona.
Aguilar’s allegations were tried over eight days. The jury found ASARCO liable on the sexual harassment claims but not on the constructive discharge or retaliation claims. Critically, the jury did not find any compensatory damages for Aguilar, instead awarding her one dollar in nominal damages for the sexual harassment claim. The jury also awarded her $868,750 in punitive damages.
ASARCO moved for judgment as a matter of law or, in the alternative, for a new trial, arguing that the punitive damages awarded were statutorily and unconstitutionally excessive.[3] The district court ordered that the punitive damages be reduced to $300,000, which is the statutory maximum under Title VII for an employer of ASARCO’s size. 42 U.S.C. § 1981a(b)(3)(D). However, the district court held that these damages were not constitutionally excessive, and declined to reduce them any further.
ASARCO timely appealed.
II
In 1996, the seminal Supreme Court case BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), changed the landscape of the law of punitive damages. Gore held that a punitive damages award which was grossly excessive could violate “[ejlementary notions of fairness enshrined in our constitutional jurisprudence.” Id. at 574, 116 S.Ct. 1589. In Gore, the Supreme Court laid out three “guideposts” for determining ex-cessiveness: (1) “the degree of reprehensibility of the defendant’s conduct”; (2) “[the] ratio to the actual harm inflicted on the plaintiff’; and (3) “civil or criminal penalties that could be imposed for comparable misconduct.” Id. at 575-83, 116 S.Ct. 1589. These guideposts need not be “rigidly or exclusively applied”; they merely provide a framework and must be viewed in the context of the case. In re Exxon Valdez, 472 F.3d 600, 613 (9th Cir.2006). Our analysis in this case is further guided both by the only other Ninth Circuit case to address the Gore guideposts *886 where the jury had only awarded nominal damages, Mendez v. County of San Bernardino, 540 F.3d 1109 (9th Cir.2008), and by cases which have considered the Gore guideposts in the context of discrimination suits.
We review the district court’s application of these principles to the jury’s award de novo. Id. at 1120. The district court’s findings of fact, however, are reviewed for clear error. Id.
A
“Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant’s conduct.” Gore, 517 U.S. at 575, 116 S.Ct. 1589. In determining the reprehensibility of conduct, the Court has instructed lower courts to consider whether:
the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.
State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). On appeal, ASARCO attempts to run through each State Farm “subfactor” and to demonstrate that each one militates toward reduced reprehensibility. In evaluating these factors, we are cognizant that the goal is to place ASARCO’s conduct “along a scale, with acts and threats of violence at the top ... and finally, [with] acts of omission and mere negligence [at the bottom].” Mendez, 540 F.3d at 1120 (quoting Swinton v. Potomac Corp., 270 F.3d 794, 818 (9th Cir.2001)) (internal quotation marks omitted). In making this determination, we are bound by the district court’s findings of fact unless clearly erroneous. See Mendez, 540 F.3d at 1120.
On the first subfactor, ASARCO argues that the lack of damages indicates that its conduct caused no harm, much less any physical harm. We reject this attempt to smuggle the inquiry for the second Gore guidepost into the first. State Farm’s direction to look at physical versus economic harm calls for us to examine the type of conduct at issue, not the magnitude of harm inflicted. In other words, State Farm’s first prong stands for the uncontroversial prospect that a defendant who has risked physical harm to a plaintiff has generally committed more reprehensible conduct than one who has risked only economic harm. When understood this way, ASARCO’s conduct plainly falls into a more serious category than mere economic harm. This court has previously noted that “intentional discrimination” is a “serious affront to personal liberty” and should be considered high on the reprehensibility scale. Zhang v. Am. Gem Seafoods, Inc., 339 F.3d 1020, 1043 (9th Cir.2003) (citing Romano v. U-Haul Int’l, 233 F.3d 655, 673 (1st Cir.2000) (finding that a plaintiffs termination on the basis of her sex was “more reprehensible than would appear in a case involving economic harms only”)).
With regard to the second subfactor, ASARCO further relies on the jury’s failure to award compensatory damages to argue that the district court clearly erred in finding “indifference or reckless disregard for Aguilar’s health and safety.” But indifference or recklessness with regard to a risk is entirely consistent with no damages, if that risk simply failed to materialize. There is ample evidence in this case to support the district court’s finding, such as Johnson’s daily advances, the targeted *887 pornographic graffiti, and Esquivel’s verbal abuse. The evidence further supports the district court’s observation that ASARCO repeatedly failed to remedy these situations. Thus, we disagree that the lack of damages renders the district court’s finding on this factor clearly erroneous.
ASARCO argues that the third State Farm subfactor — financial vulnerability— has no relevance unless ASARCO targeted Aguilar because of such vulnerability. This argument relies upon a misreading of In re Exxon Valdez, 472 F.3d at 617. That case addressed Exxon’s reprehensibility with regard to the 1989 Exxon-Valdez oil spill. The court held that Exxon’s reprehensibility was not increased by this factor simply because financially vulnerable subsistence fishermen were affected. Id. at 616-17. As the court stated, there must be “some element of intent to harm particular individuals or categories of individuals.” Id. at 617. In this case Exxon’s requirement of “intent to harm” is met. Aguilar was the target of intentional sexual harassment; she was not a bystander affected by an outpouring of general negligence like the fishermen in Exxon Valdez. Indeed, in order to award punitive damages under Title VII, the jury necessarily found that ASARCO acted “with malice ... [or] with reckless indifference to the federally protected rights of [Aguilar].” ASARCO is right to a limited extent: Aguilar’s financial vulnerability is not as significant as it would be if it had been directly exploited, as in a fraud case. But it is still relevant that Aguilar was an individual employee of limited means subject to the recklessness or malice of a large corporate bureaucracy. See Goldsmith v. Bagby Elevator Co., 513 F.3d 1261 (11th Cir.2008) (considering financial vulnerability prong in Title VII suit for racial discrimination and retaliation); Bains LLC v. Arco Prods. Co., 405 F.3d 764, 775 (9th Cir.2005) (considering financial vulnerability prong in suit by Sikh-owned corporation for racial discrimination).
ASARCO challenges the district court’s conclusion, on the fourth State Farm sub-factor, that ASARCO’s conduct “involved repeated actions,” alleging that the “three incidents” involving different personnel are facially insufficient to “label a defendant a recidivist.” ASARCO clouds the waters by characterizing this inquiry as being about “recidivism”; State Farm makes clear that this sub-factor goes to establishing the uncontroversial prospect that “isolated incidents” are less reprehensible than “conduct involving] repeated actions.” State Farm, 538 U.S. at 419, 123 S.Ct. 1513. There was nothing “isolated” about the conduct here, which involved repeated harassment by Wayne Johnson, pornographic graffiti which was not addressed, and cruel treatment by Esquivel over a lengthy period. Aguilar made repeated complaints which, as the district court found, went repeatedly unaddressed.
Finally, ASARCO, even attempts to argue that its conduct did not involve “intentional malice, deceit, or trickery.” This argument is in the face of the jury’s finding, noted above, that ASARCO acted “with malice ... [or] with reckless indifference to the federally protected rights of [Aguilar]” and the district court’s finding that “ASARCO acted with a higher level of indifference, if not malice.” ASARCO again relies on Exxon Valdez, where the court concluded that Exxon’s reckless conduct “did not result in intentional damage to anyone” and that this subfactor “militate[d] against viewing Exxon’s misconduct as highly reprehensible.” In re Exxon Valdez, 472 F.3d at 618. But, as the district court’s findings reveal, ASARCO’s conduct toward Aguilar was targeted, worse than reckless, and served no possible productive purpose. See Bains, 405 *888 F.3d at 775 (“An Exxon oil tanker that performs a socially valuable task can accidently run aground.... By contrast there can be no excuse for intentional, repeated [] harassment”). Exxon Valdez does not help ASARCO. This factor also supports substantial damages.
Our analysis of each subfactor reveals that the district court did not err in concluding that ASARCO’s conduct supports the imposition of a very large punitive award. Indeed, many other cases involving lengthy periods of harassment and discrimination have .noted that similar conduct is highly reprehensible along these dimensions. See, e.g., EEOC v. AutoZone, Inc., 707 F.3d 824, 839 (7th Cir.2013) (weighing all five subfactors against employer who discriminated against disabled employee); Bains, 405 F.3d at 775; Goldsmith, 513 F.3d at 1283 (concluding employer conduct “was sufficiently reprehensible to support an award of punitive damages because the harm suffered by [plaintiff] was not purely economic, [plaintiff] was financially vulnerable, and the racially offensive comments and conduct were not isolated.”); Zhang, 339 F.3d at 1044 (“We have no trouble concluding that the corporate defendants’ discrimination against Zhang was sufficiently reprehensible.”); Swinton, 270 F.3d at 818 (“In sum, we have no trouble concluding that the highly offensive language directed at Swinton, coupled by the abject failure of Potomac to combat the harassment, constitutes highly reprehensible conduct.”). We conclude that substantial punitive damages are constitutionally acceptable in this case.
B
We next turn to the second Gore factor. And although we concluded that ASARCO’s arguments regarding its reprehensibility are without merit, its arguments about this Gore factor stand on stronger ground. The Supreme Court has noted that “[punitive] damages must bear a reasonable relationship to compensatory damages.” Gore, 517 U.S. at 580, 116 S.Ct. 1589 (internal citations and quotation marks omitted). Further, the Court has stated that “few awards exceeding a single-digit ratio between punitive and compensatory damages ... will satisfy due process.” State Farm, 538 U.S. at 425, 123 S.Ct. 1513. Nonetheless, the Court has steadfastly refused to create a bright-line ratio and has emphasized that a higher ratio is justified when “a particularly egregious act has resulted in only a small amount of economic damages.” Id.
The district court in this case approved a punitive award with a ratio of 300,000 to l.[4] If allowed, it would surely be among the highest (if not the highest) ratio approved since Gore changed the landscape and the highest ratio we could locate in a survey of discrimination cases.[5] The *889 highest ratio among these cases is the 125,000 to one ratio approved by the Fifth Circuit in Abner v. Kansas City Southern Railroad Co.[6] That is less than half of the ratio at issue here.
It seems clear, based on the analysis of the State Farm, subfactors, that this is a “particularly egregious act.” State Farm, 538 U.S. at 425, 123 S.Ct. 1513. But even “particularly egregious acts” are subject to the requirement of reasonableness. The Supreme Court has repeatedly emphasized the importance of the ratio inquiry and we cannot cast it aside. Gore, 517 U.S. at 583, 116 S.Ct. 1589 (calling a 500 to 1 ratio “breathtaking” and stating that it rightly “raise[d] a suspicious judicial eyebrow”); State Farm, 538 U.S. at 426, 123 S.Ct. 1513 (“courts must ensure that the measure of punishment is both reasonable and proportionate ... ”). But knowing that the ratio guidepost must inform our analysis does not tell us what ratio would be appropriate in a given case.
So although we conclude that the requirement of a reasonable relationship between compensatory and punitive damages suggests that these damages should be reduced, a third Gore factor must be considered before we can make a final determination.
C
The third Gore factor asks us to compare the punitive damages award to “civil or criminal penalties that could be imposed for comparable misconduct.” Gore, 517 U.S. at 583, 116 S.Ct. 1589. The district court below relied on Zhang v. American Gem Seafoods, Inc., 339 F.3d 1020 (9th Cir.2003), and Swinton v. Potomac Corp., 270 F.3d 794 (9th Cir.2001), and held that it was appropriate to treat Title YII’s damages cap as “a legislative judgment similar to the imposition of a civil fine.” Zhang, 339 F.3d at 1044. Although both Zhang and Swinton were *890 § 1981 cases rather than Title VII cases, the district court saw them as standing for the idea that punitive awards below the statutory cap are generally constitutionally reasonable.[7]
ASARCO argues that the statutory cap is not a relevant “civil penalty” by which to benchmark the punitive award in this case and that “constitutional questions [cannot] turn on congressional judgments.” Williams v. ConAgra, 378 F.3d 790, 798 (8th Cir.2004). These arguments miss the mark. First, this is clearly a relevant “civil penalty”: the existence of a statutory cap gives defendants “fair notice ... of the severity of the penalty that a State may impose.” Gore, 517 U.S. at 574, 116 S.Ct. 1589. Second, Gore’s guidepost specifically directs courts to look at comparable civil and criminal penalties. This rule necessarily ensures that constitutional questions turn in part on congressional judgments.
Williams, which struck down a $6,063,750 punitive damages award as unconstitutionally excessive, is not to the contrary. With respect to the third Gore guidepost, Williams only suggested that the Title VII cap might not represent an appropriate benchmark with respect to an award in a § 1981 case. However, this is a genuine Title VII case. The $300,000 damages cap surely represents an example of a “legislative judgment[ ] concerning appropriate sanctions for the conduct at issue.” Gore, 517 U.S. at 583, 116 S.Ct. 1589 (quoting Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 301, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (O’Connor, J., concurring in part and dissenting in part)). We agree with the district court that this factor weighs in favor of damages at least on the order of the statutory cap.
D
Given ASARCO’s highly reprehensible conduct and the presence of a comparable civil penalty in the form of the Title VII damages cap, we conclude that the Constitution does not bar the imposition of a substantial punitive award in this case. But this does not change the fact that a 300,000 to 1 ratio raises our “judicial eyebrow[s].” Gore, 517 U.S. at 583, 116 S.Ct. 1589.
In Mendez v. County of San Bernardino, the only other Ninth Circuit case to address the Gore guideposts where only nominal damages were awarded, the court held a $250,000 award excessive. Mendez, 540 F.3d at 1122-23. The defendant in that case, an officer, was found to have recklessly disregarded the constitutional rights of a Spanish-speaking woman when he took advantage of her poor grasp of English and railroaded her into consenting to a search of her home. Id. at 1116. Mendez was awarded only $1 on each of her false arrest and illegal search claims but $250,000 in punitive damages against the officer. The court relied heavily upon the second Gore guidepost in striking down the award, noting that the $250,000 *891 figure was “staggering” in light of the lack of actual damages. Id. at 1122.
Importantly, the court in Mendez approved the district court’s remittitur of Mendez’s award to $5,000 — a 2,500 to one ratio, because Mendez involved well in excess of the traditional ten to one that the Supreme Court has approved. Id. This provides us with at least some guidance as to how to reduce this award, and ASARCO argues that we should follow Mendez’s ratio and remit punitive damages in this case to $2,500.
We disagree. The court in Mendez noted substantially less reprehensibility than there was in this case: the court concluded that the officer’s conduct was closer to mere accident than to malice, the conduct was an isolated incident, and the conduct posed no risk to Mendez’s health or safety. Id. at 1121. Here, all of those factors are reversed, so it stands to reason that ASARCO’s conduct supports a higher ratio of damages. Furthermore, the third Gore guidepost was of no help in Mendez, while here it weighs in favor of a larger award. Finally, Mendez noted the importance of an award “sufficient to deter [defendants] from engaging in similar conduct in the future.” Id. at 1122. A $2,500 award would clearly be insufficient to deter ASARCO in this case, even considering the award of $350,903 in attorneys’ fees.
Although we think a ratio higher than 2,500 to one is called for by ASARCO’s conduct, the $300,000 awarded was nonetheless excessive. As we indicated above, no court in a discrimination case has ever upheld a ratio of punitive damages to compensatory damages greater than 125,000 to 1. Many discrimination cases have struck down awards as constitutionally excessive with substantially smaller ratios. See Thomas v. iStar Fin., Inc., 652 F.3d 141, 149-50 (2d Cir.2011) (holding that a $1.6 million punitive damages award, in comparison to a $280,000 compensatory damages award, violates due process); Mendez-Matos v. Mun. of Guaynabo, 557 F.3d 36, 55 (1st Cir.2009) (holding that a $350,000 punitive damages award, in comparison to a $35,000 compensatory damages award, violates due process); Bains, 405 F.3d at 776-77 (holding that a $5 million punitive damages award, in comparison to a $50,000 compensatory damages award, violates due process); Williams, 378 F.3d at 798 (holding that a $6,063,750 punitive damages award, in comparison to a $600,000 compensatory damages award, violates due process); Lincoln v. Case, 340 F.3d 283, 294 (5th Cir.2003) (holding that a $100,000 punitive damages award, in comparison to a $500 compensatory damages award, violates due process); Ross v. Kan. City Power & Light Co., 293 F.3d 1041, 1049 (8th Cir.2002) (holding that a $120,000 punitive damages award, in comparison to a $6,000 compensatory damages award, violates due process); Rubinstein v. Adm’rs of Tulane Educ. Fund, 218 F.3d 392, 408 (5th Cir.2000) (holding that a $750,000 punitive damages award, in comparison to a $2,500 compensatory damages award, violates due process).
Our task in reducing the award is not easy. No bright line ratio has been set by the Supreme Court for cases which are “particularly egregious.” State Farm, 538 U.S. at 425, 123 S.Ct. 1513. Since nothing compels a particular dollar figure, we conclude that the highest punitive award supportable under due process is $125,000, in accord with the highest ratio we could locate among discrimination cases. Abner, 513 F.3d at 164. We think this is the highest award which maintains the required “reasonable relationship” between compensatory and punitive damages. Gore, 517 U.S. at 580, 116 S.Ct. 1589. This award is nonetheless on the order of *892 the damages cap in Title VII and proportional to the reprehensibility of ASARCO’s conduct.
Ill
We conclude that the punitive damages award of $300,000 is outside of constitutional limits, so it must be vacated. On remand, the district court may order a new trial unless the plaintiff accepts a remittitur to $125,000.
Each party shall bear its own costs on appeal.
VACATED AND REMANDED for proceedings consistent with this opinion.

. ASARCO characterizes Aguilar's interactions with Wayne Johnson quite differently. It highlights that, when Aguilar met with HR about Johnson, contemporaneous notes of that meeting reveal that Aguilar told HR that Johnson "ha[dn't] touched her” and was "a complete gentlemen.” It also points out that Aguilar wrote, in December 2006 notes, that Johnson's behavior was a "small problem.”

. The graffiti in the 2007 photographs is pornographic, but it is partially painted over and does not appear to be the graffiti described by Aguilar.

. ASARCO also raised several other issues on appeal, which we address in a memorandum disposition filed concurrently with this opinion. In that memorandum disposition, we also address whether the district court erred in awarding attorneys fees to Aguilar.

. We evaluate the ratio with regard to $300,000, rather than with regard to the $868,750 that the jury awarded. Other courts have done the same. See, e.g., AutoZone, Inc., 707 F .3d at 839-40 (utilizing reduced $200,000 figure for ratio rather than $500,000 awarded by jury); MacGregor v. Mallinckrodt, Inc., 373 F.3d 923, 933 (8th Cir.2004) (utilizing reduced $300,000 figure for ratio rather than $829,197 awarded by jury); Romano, 233 F.3d at 673 (utilizing reduced $285,000 figure for ratio rather than $650,000 awarded by jury).

. See AutoZone, Inc., 707 F.3d at 839-40 (upholding a $200,000 punitive damages award and a $100,000 compensatory damages award); Trickey v. Kaman Indus. Techs. Corp., 705 F.3d 788, 804 (8th Cir.2013) (upholding a $500,000 punitive damages award and a $100,000 compensatory damages award); Equal Employment Opportunity Comm’n v. Fed. Express Corp., 513 F.3d 360, 377-78 (4th Cir.2008) (upholding a $100,000 punitive damages award and an $8,000 compensatory damages award); Goldsmith, 513 F.3d at *889 1283 (upholding a $500,000 punitive damages award and a $54,321 compensatory damages award); Tisdale v. Fed. Express Corp., 415 F.3d 516 (6th Cir.2005) (upholding a $100,000 punitive damages award and a $15,000 compensatory damages award); MacGregor, 373 F.3d at 933 (upholding a $300,000 punitive damages award and a $170,803 compensatory damages award); Zhang, 339 F.3d at 1044 (upholding a $2,600,000 punitive damages award and a $360,000 compensatory damages award); Bogle v. McClure, 332 F.3d 1347, 1362 (11th Cir.2003) (upholding a $13,300,000 punitive damages award and a $3,500,000 compensatory damages award); Swinton, 270 F.3d at 819 (upholding a $1,000,000 punitive damages award and a $35,600 compensatory damages award); Zimmerman v. Direct Fed. Credit Union, 262 F.3d 70, 82 (1st Cir.2001) (upholding a $400,000 punitive damages award and a $200,000 compensatory damages award); Hampton v. Dillard Dep't Stores, 247 F.3d 1091, 1117 (10th Cir.2001) (upholding a $1,100,000 punitive damages award and a $56,000 compensatory damages award); Romano, 233 F.3d at 673 (upholding a $285,000 punitive damages award and a $15,000 compensatory damages award); Equal Employment Opportunity Comm’n v. W & O, Inc., 213 F.3d 600, 617 (11th Cir.2000) (upholding a $300,000 punitive damages award and a $36,257.13 compensatoiy damages award); Deters v. Equifax Credit Info. Servs., Inc., 202 F.3d 1262, 1273 (10th Cir.2000) (upholding a $295,000 punitive damages award and a $5,000 compensatory damages award); Shea v. Galaxie Lumber & Constr. Co., 152 F.3d 729, 736 (7th Cir.1998) (upholding a $2,500 punitive damages award and a $1 compensatory damages award).

. The Fifth Circuit has specifically rejected the applicability, of the "ratio” prong of Gore in any case involving nominal damages. See Williams v. Kaufman Cnty., 352 F.3d 994, 1016 (5th Cir.2003) ("[A]ny punitive damages-to-compensatory damages ‘ratio analysis' cannot be applied effectively in cases where only nominal damages have been awarded.”). This is not the rule in the Ninth Circuit, see Mendez v. County of San Bernardino, 540 F.3d 1109 (9th Cir.2008).

. Along similar lines, the Fifth Circuit upheld a $125,000 punitive award in a case involving race-based hostile work environment claims where the plaintiffs were only awarded $1 in nominal damages, primarily on the basis of the existence of Title VII's statutory cap. Abner v. Kansas City S. R.R. Co., 513 F.3d 154, 164 (5th Cir.2008). According to the court in that case, "the combination of the statutory cap and [the] high threshold of culpability" confined any award to a level tolerated by due process. Id. According to the court, the only way a Title VII award could offend due process would be if the statutory cap itself offended due process. Id. Although certainly the statutory cap and the high threshold of culpability impact our Gore analysis, no authority supports the Fifth Circuit’s conclusion that Gore is rendered extraneous by the existence of these factors in Title VII.